UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| Bridget C., | : | |
| | : | |
| *Plaintiff,* | : | |
| | : | |
| v. | : | |
| | : | No. 3:20-CV-1740(SRU) |
| Kilolo Kijakazi, | : | |
| | : | |
| Acting Commissioner of | : | |
| Social Security, | : | |
| | : | |
| *Defendant.* | : | |
| ————————————————X | | |

## <u>RECOMMENDED RULING ON PENDING MOTIONS</u>

Plaintiff Bridget C. (hereinafter, the "plaintiff") brings this administrative appeal pursuant

to 42 U.S.C. § 405(g). She appeals the decision of defendant Kilolo Kijakazi, Acting

Commissioner of the Social Security Administration[1] (hereinafter, the "Commissioner") denying

her applications for disability insurance benefits pursuant to Title II of the Social Security Act

and supplemental security income benefits pursuant to Tittle XVI of the Act. The plaintiff now

moves for an order reversing the Commissioner's decision. *See* Pl.'s Mot. for J. on the

Pleadings, Doc. No. 21. The Commissioner contends that her decision is supported by

substantial evidence in the record and moves for an order affirming the decision. *See* Def.'s Mot.

for Order Affirming the Decision of the Comm'r, Doc. No. 29. For the reasons set forth below,

the Court recommends that the Plaintiff's Motion for Judgment on the Pleadings (Doc. No. 21)

be **GRANTED** and that the matter be remanded for further proceedings, and that the

---

[1] Since the filing of this case, Kilolo Kijakazi became the Acting Commissioner of the Social Security
Administration. She is therefore automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).

Commissioner's Motion to Affirm (Doc. No. 29) be **DENIED.**

## I.    <u>STANDARD OF REVIEW</u>

Under the Social Security Act, the term "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant will meet this definition if his or her impairments are of such severity that the claimant cannot perform previous work and also cannot, considering the claimant's age, education, and work experience, "engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Commissioner must follow a sequential evaluation process for assessing disability claims. The five steps of this process are as follows: (1) the Commissioner considers whether the claimant is currently engaged in substantial gainful activity; (2) if not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities; (3) if the claimant has a "severe impairment," the Commissioner must ask whether, based solely on the medical evidence, the claimant has an impairment which "meets or equals" an impairment listed in Appendix 1 of the regulations ("the Listings"). If so, and it meets the durational requirements, the Commissioner will consider the claimant disabled, without considering vocational factors such as age, education, and work experience; (4) if not, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has the residual functional capacity to perform his or her past work; and (5) if the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work in the national economy which the claimant can perform. *See* 20

2

C.F.R. §§ 404.1520; 416.920.  The claimant bears the burden of proof on the first four steps,

while the Commissioner bears the burden of proof on the final step.  *McIntyre v. Colvin*, 758

F.3d 146, 150 (2d Cir. 2014).

   "A district court reviewing a final . . . decision [of the Commissioner of Social Security]

pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), is performing an

appellate function."  *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981).  "The findings of

the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be

conclusive[.] "  42 U.S.C. § 405(g).  Accordingly, the district court may not make a *de novo*

determination of whether a plaintiff is disabled in reviewing a denial of disability benefits.

*Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the

court's function is to first ascertain whether the Commissioner applied the correct legal

principles in reaching his conclusion, and then whether the decision is supported by substantial

evidence.  *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).  Therefore, absent legal error, a

decision of the Commissioner cannot be set aside if it is supported by substantial evidence.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982).  Substantial evidence is "such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion[.]"  *Williams v.

Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  It must be "more than a mere scintilla or a touch of

proof here and there in the record."  *Id.*  If the Commissioner's decision is supported by

substantial evidence, that decision will be sustained, even where there may also be substantial

evidence to support the plaintiff's contrary position.  *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d

Cir. 1982).  "The substantial evidence standard means once an ALJ finds facts, [the reviewing

court] can reject those facts only if a reasonable factfinder would *have to conclude otherwise*."

*Brault v. Social Sec. Admin., Com'r*, 683 F.3d 443, 448 (2d Cir. 2012)(emphasis in

original)(internal citation and quotations omitted).

## II.    FACTS[2]

### a.  Factual Allegations

Plaintiff suffers from a variety of medical conditions, including post-traumatic stress disorder, major depressive disorder, anxiety, thoracic spine strain, migraine headaches, insomnia, vertigo and visual limitations in the left eye, all of which arose from an incident that occurred on June 2, 2017, when a passenger van crashed into the wall and window of her apartment while she was sleeping on a couch.  R. 15-16, 49, 943.  Plaintiff reported that, while the vehicle did not strike the couch, she was startled awake and felt some strain in her back.  R. 945.  Plaintiff was transported to ECHN Rockville General Hospital and complained of "pain in the left side of her upper and mid back[.]"  R. 945.  Plaintiff was released from the Emergency Department that same day.  *Id.*  Upon discharge, plaintiff was permitted to return to work within three days, and was not permitted to engage in any heaving lifting for seven days.  R. 946.

On June 9, 2017, plaintiff began treating with her primary care provider, Robert Ballough, PA (hereafter "Dr. Ballough"), of First Choice Health Centers for symptoms stemming from the accident.  R. 615.  Dr. Ballough diagnosed plaintiff with post-traumatic stress disorder, acute back pain, and bilateral acute serous otitis media (ear-ache), and referred plaintiff to "[c]ounseling asap."  R. 616-617.[3]

Thereafter, plaintiff received therapy from Teodoro Diaz, a licensed clinical social worker from First Choice Health Centers, beginning on June 14, 2017.  R. 613.  On December

---

[2] The following facts are drawn primarily from plaintiff's Statement of Material Facts in Support of Motion for Judgment, Doc. No. 21-2, to which the Commissioner did not object in substance.

[3] In subsequent visits with Dr. Ballough, who treated plaintiff through July 2019, plaintiff reported recurring headaches and other symptoms she attributed to the accident, such as back pain, stress, anxiety and memory loss.  R. 610, 605, 588, 578, 573.  Plaintiff also received chiropractic care from April Little, D.C., from July 26, 2017, through January 16, 2018.  R. 474-531.

13, 2017, Diaz and Dr. Ballough together completed a Medical Exemption Report for the Connecticut Department of Social Services where they described plaintiff as having "complex trauma" because she is "extremely hypervigilant" and has "extreme difficulty falling and staying asleep[.]"  R. 957.  Diaz and Dr. Ballough diagnosed plaintiff with post-traumatic stress disorder and major depressive disorder.  R. 956.  In this report, Diaz and Ballough stated that plaintiff would be able to return to work in June 2018.  *Id*.  They described plaintiff's prognosis as "poor" because of plaintiff's "inability to sleep" and her "constant thought that [a] vehicle may come through her living room[.]"  R. 957.  On June 21, 2018, Diaz completed a second Employment Services Medical Exemption Report.  R. 878-880.  In this subsequent report, plaintiff's diagnosis remained unchanged.  R. 878.  However, on this occasion, Diaz reported that he was "unable to determine" when plaintiff would be able to return to work.  R. 878.  Diaz noted that plaintiff's prognosis was "[f]air at best" and that she had started Eye Movement Desensitization and Reprocessing ("EMDR") therapy to "hopefully begin the process of alleviating the trauma."  R. 879.

On November 22, 2017, plaintiff underwent an MRI, without contrast, of the brain.  R. 384-385.  The interpreting radiologist, Neal Barkoff, M.D. (hereinafter, "Dr. Barkoff"), found that the "MRI of the brain [was] limited due to extensive ferromagnetic artifact from dental work."  R. 384. Otherwise, the imaging appeared to be normal.  R. 384, 441.  On November 30, 2017, Dr. Ballough reviewed patient's MRI results and noted that the "MRI was distorted due to dental work."  R. 396.  Dr. Ballough then referred plaintiff to a neurologist.  *Id.*

Pursuant to this referral, plaintiff underwent a neuro-psychological evaluation at Hartford Psychological Services where seven tests were administered by examiners Sita

Nadathur, M.A., and Rafael Mora de Jesus, Ph. D. R. 373, 759-760.[4] Here, the examiners diagnosed plaintiff with adjustment disorder with anxiety, post-traumatic stress disorder and cervical cancer in remission. R. 760. The examiners recommended "adopting new strategies for attending to and remembering details…engaging in evidence-based trauma specific therapies…[and] learning strategies to effectively manage stress[.]" R. 760.

On November 6, 2017, Natasa Dragicevic, M.D. (hereinafter, "Dr. Dragicevic"), a neurologist at UConn Health Center, also evaluated plaintiff. R. 443. Dr. Dragicevic reviewed both plaintiff's MRI and the results of the neuropsychological testing. R. 441. Dr. Dragicevic found the MRI to be "normal[,]" and plaintiff's "anxiety[,] depression and PTSD as cause of her memory loss and confusion." R. 441. Dr. Dragicevic referred plaintiff for a psychiatric evaluation at UConn Psychiatry. *Id.* It is unclear from the record as to whether plaintiff followed-up with the referral for psychiatry services.

On May 21, 2018, plaintiff returned to Dr. Dragicevic and reported that she was "still having a lot of anxiety[,] depression [and] PTSD and [it was] bringing her a lot of stress." R. 754. At this visit, Dr. Dragicevic found that "all work up [] had been unrevealing thus far … [and plaintiff's] physical symptoms are most likely manifestations of her depression, anxiety and stress." R. 756.

On March 26, 2018, plaintiff began to see Courtney McBurney, LCSW, for individual EMDR therapy sessions. R. 537. However, on October 9, 2018, plaintiff discontinued her EMDR sessions to focus on other aspects of her individual therapy. R. 997.

---

[4] The following tests were administered: Wechsler Adult Intelligence Scale – IV; The Berry-Buk-tenica Developmental Test of Visual-Motor Integration; Neuropsychological Assessment Battery-Screener; Neuropsychological Assessment Battery-Memory; Selected subtests of the Delis Kaplan Executive Function Systems; Personality Assessment Inventory; and Trauma Symptom Inventory-2.

Thereafter, plaintiff underwent a neuropsychological evaluation at Gaylord Hospital by Kristen Wrocklage, Ph. D. (hereinafter, "Dr. Wrocklage") on November 8, 2018.  R. 1022-1027. Dr. Wrocklage found that plaintiff's "cognitive profile [was] broadly within normal limits, with some mild variability but no impairment identified in any cognitive domain."  R. 1025.  In short, Dr. Wrocklage did not find any cognitive impairments.  *Id*.  Dr. Wrocklage concluded that plaintiff's "cognitive performances were not impaired and her profile [did] not meet criteria for a cognitive diagnosis…[and] her reported daily difficulty with cognition and functioning are judged to reflect a combination of factors including physical pain/migraines, insufficient sleep/endorsed fatigue, and psychiatric distress."  *Id.*  Dr. Wrocklage recommended that plaintiff: 1) continue with her mental health treatment; 2) be evaluated by a physical therapist; 3) continue attending medical appointments; and 4) incorporate good sleep hygiene practices into her daily routine.  R. 1025-1026.  Dr. Wrocklage further opined that a neuropsychological follow-up was not warranted.  R. 1026.

On December 10, 2018, plaintiff began attending physical and speech therapy sessions at Gaylord Hospital.  R. 1028, 1036.  On that same day, plaintiff began counseling sessions with Joanne Hutt, Ph. D. (hereinafter, "Dr. Hutt") who diagnosed plaintiff with PTSD, insomnia, adjustment disorder with anxiety and depressed mood, somatic symptom disorder, post-concussive syndrome and nicotine dependence.  R. 1093.  Dr. Hutt saw plaintiff for six sessions and discharged her on February 15, 2019.  R. 1087.  Upon discharge, Dr. Hutt wrote, "[patient] has not seen any improvement in her symptoms. This is ultimately due to the fact that she was unable to focus solely on the therapeutic strategies that are part of behavioral pain management therapy, which was the focus of our work…[i]t quickly became apparent that, due to her physical, emotional symptoms and lack of sleep, she could not carry out the HW assignments[.]"

R. 1087.  Plaintiff was discharged to attend therapy closer to home.  *Id*.  Plaintiff was also

discharged from speech therapy on that day.[5]  R. 1070.

At the request of plaintiff's physical therapist, plaintiff underwent a neuro-optometric

consultation on January 30, 2019, with John J. Pulaski, OD, FCSO (hereinafter, "Dr. Pulaski").

R. 1041-1042.  Dr. Pulaski diagnosed plaintiff with convergence insufficiency; saccadic

dysfunction; photophobia; visual Symptoms of post-concussive syndrome; and visual processing

deficits.  R. 1042. Dr. Pulaski recommended additional testing "to more clearly evaluate the

degree of [plaintiff's] impairments."  *Id*.  The record does not reflect any further treatment by Dr.

Pulaski.

On January 11, 2019, plaintiff underwent an independent medical examination by Adam

S. Mednick, Ph. D., M.D. (hereinafter, "Dr. Mednick"), at CT Comprehensive Neurologic

Management.  R. 1071-1082.  Dr. Mednick found that plaintiff had "reached maximal medical

improvement" and that she had a "combined permanent whole person partial impairment of 11

[percent]."  R. 1080.  The eleven percent is distributed as follows: three percent to headaches;

five percent to mental status; and three percent to her lumbar spine.  *Id*.  In Dr. Mednick's

assessment he wrote that plaintiff "is fully capable of self-care."  R. 1078.  Dr. Mednick

concluded that "based upon [plaintiff's] symptoms, physical examination, and the results of her

extensive neurodiagnostic evaluation[,]" plaintiff suffers from musculo-skeletal strain/sprain

injuries to the thoracic spine and lumbar spine, headaches, cognitive difficulties and

anxiety/PTSD.  R. 1081.

---

[5] Lastly, on March 1, 2019, plaintiff began seeing Geoffrey Fabry, PT, for physical therapy at Hartford Healthcare.
R. 1151.  Plaintiff's last recorded appointment with Fabry was on March 14, 2019.  R. 1163. On plaintiff's final visit
Fabry wrote that patient had demonstrated some improvement in the initial visits, but that headaches had returned.
R. 1163.

On January 18, 2019, Dr. Ballough, who treated plaintiff through July 11, 2019 (R. 1195) authored a medical source statement on July 18, 2019 (R. 1205-1207) opining on plaintiff's physical and mental limitations.  R. 1205-1207.  Specifically, Dr. Ballough noted that plaintiff was diagnosed with post-concussive syndrome, memory loss and PTSD and that she could not tolerate low stress work.  R. 1205-1207. Dr. Ballough also specified that plaintiff had no physical limitations as to "reaching, handling or fingering[,]" that she could frequently lift less than 10 pounds, and only occasionally twist, climb stairs, kneel and balance.  R. 1206.

### b.  Procedural History

Plaintiff filed her Title II application for disability insurance benefits (hereinafter, "DIB") and Title XVI application for Social Security Income (hereinafter, "SSI") on December 12, 2017. R. 101-102.  In both applications, plaintiff alleged a disability onset date of June 2, 2017.  R. 87, 94.    The claims were denied at the initial and reconsideration levels.  R. 87-100, 103-142. Thereafter, plaintiff requested a hearing.  R. 176.

On August 28, 2019, Administrative Law Judge Michael McKenna (hereinafter, the "ALJ") conducted a hearing.  R. 39.  Plaintiff was represented by counsel.  R. 39-85.  On September 27, 2019, the ALJ issued a decision denying plaintiff's claims.  R. 13-22.  Plaintiff subsequently requested review of the ALJ's decision by the Appeals Council. R. 235-238.  On August 19, 2020, the Appeals Council granted plaintiff's request for review.  R. 239-242.  On September 23, 2020, the Appeals Council issued its decision and found that plaintiff was not disabled.  R. 4-7.  Plaintiff filed the present action in this Court for a review of the Commissioner's decision because the Appeals Council's decision is considered the final determination of the Commissioner, and therefore, plaintiff's sole option for relief is review by

the district court.

### c. *The ALJ's Decision*

The ALJ followed the sequential evaluation process to determine whether plaintiff was disabled under the Social Security Act.

At Step One, the ALJ found plaintiff did not engage in substantial gainful activity since June 2, 2017, the application date. R. 15. At Step Two, the ALJ concluded that plaintiff has the following severe impairments: posttraumatic stress disorder, major depressive disorder and anxiety. *Id*. At Step Three, the ALJ held that plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. R. 16-17. That is, the ALJ found that plaintiff's impairments were not *per se* disabling because they were not severe enough to meet the criteria of an impairment listed in 20 C.F.R. part 404, subpart P, Appendix 1. *Id.* Next, the ALJ determined plaintiff retains the following residual functional capacity[6]:

> [T]o perform a full range of work at all exertional levels but with the following non-exertional limitations: The claimant is able to have occasional interaction with supervisors and coworkers, and incidental contact with the public.

R. 17.

At Step Four, the ALJ found that plaintiff is able to perform past relevant work as a personal care assistant because this type of "work does not require the performance of work-related activities precluded by the claimant's residual functional capacity." R. 21. As such, there was no need for the ALJ to continue to Step Five of the evaluation process because he determined that plaintiff was "not disabled under sections 216(i) and 223(d) of the Social

---

[6] Residual functional capacity (hereinafter, "RFC") is the most a claimant can do in a work setting despite his or her limitations. 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1).

Security Act." R. 21.

### d.  *The Appeals Council's Decision*

Following the ALJ's unfavorable decision, plaintiff sought review by the Appeals

Council. R. 235-238. The Appeals Council granted plaintiff's request for review on August 19,

2020.  R. 239.  In its review, the Appeals Council ultimately found that plaintiff was not disabled

during the relevant time period.  R. 6.  The Appeals Council adopted many of the ALJ's findings,

specifically the ALJ's "statements regarding the pertinent provisions of the Social Security Act,

Social Security Administration Regulations, Social Security Rulings and Acquiescence Rulings,

the issues in the case, and the evidentiary facts, as applicable."  R. 4.  The Appeals Council also

adopted the ALJ's "findings or conclusions regarding whether the claimant [was] disabled[,]"

specifically agreeing with the ALJ's "findings under steps 1, 2, and 3 of the sequential

evaluation" process.  R. 4.  In support of its agreement with the ALJ's findings, the Appeals

Council wrote:

> At step 1, we adopt the finding that the claimant has not engaged in substantial gainful
> activity since June 2, 2017, the date she alleged disability began.
>
> At step 2, we adopt the finding that the claimant has severe impairments of posttraumatic
> stress disorder, major depressive disorder, and anxiety.
>
> At step 3, we adopt the finding that the claimant does not have an impairment or
> combination of impairments that meets or medically equals the severity of the
> impairments listed at 20 CFR Part 404, Subpart P, Appendix 1. Specifically, regarding
> listings 12.04, 12.06, and 12.11, we adopt the finding that the claimant has mild
> limitations in the ability to interact with others; mild limitations in the ability to
> concentrate, persist, or maintain pace; and mild limitations in the ability to adapt or
> manage herself.
>
> We also adopt the finding that the claimant has the residual functional capacity to
> perform a full range of work at all exertional levels, but can have only occasional
> interaction with supervisors and coworkers, and only incidental contact with the public.

R. 4-5.  The Appeals Council's most significant disagreement with the ALJ's findings came at

Step Four where the Appeals Council concluded that plaintiff was "unable to perform any past

relevant work, as the requirements [of a personal care assistant] exceed[ed plaintiff's] residual

functional capacity."  R. 5.  Specifically, the appeals council noted that an individual working as

a personal care assistant would have more than just "occasional interactions" with

coworkers/supervisors, and more than just "incidental contact with the public[.]"  R. 5 (internal

citations omitted).  Therefore, at Step Four, the Appeals Council determined that plaintiff was

"unable to perform her past relevant work[.]"  R. 5.

Having concluded that plaintiff could no longer perform her past relevant work, the

Appeals Council was required to continue onto Step Five of the evaluation process.  At Step

Five, the Appeals Council relied on the testimony of Vocational Expert, Dennis King

(hereinafter, the "VE"), who testified at the August 2019 hearing and opined that there are jobs

existing in significant numbers in the national economy that plaintiff can perform.  R. 5.

Specifically, the VE testified that a person with plaintiff's vocational factors and the assessed

RFC can perform the positions of janitor, order picker and packer, of which there were

approximately 2,604,000 jobs, 2,046,040 jobs and 700,560 jobs, respectively in the national

economy.  R. 5; R. 78. Accordingly, the Appeals Council determined that plaintiff "has not been

disabled from her alleged onset date of June 2, 2017 through the date of the hearing decision,

September 27, 2019."  R. 5.

## III.    DISCUSSION

On appeal, plaintiff claims that she is entitled to a reversal of the Commissioner's decision

and requests that the matter be remanded for further proceedings.  *See generally* Pl.'s Mot. for J.

on the Pleadings, Doc. No. 21.  Plaintiff principally argues that: 1) the ALJ's analysis at Step

Two of plaintiff's medically determinable impairments and severity was inadequate as it relates

to plaintiff's headaches and left eye convergence; 2) the Step Three analysis was insufficient as

12

to the severity of plaintiff's mental health impairments; and 3) the ALJ's vocational analysis was deficient and did not satisfy the Commissioner's burden.  *Id.*  The Commissioner counters that: 1) the ALJ considered any non-severe impairments at subsequent stages of the evaluation; 2) the plaintiff failed to meet her burden showing that she satisfied the listing criteria; and 3) that the VE's testimony supported a finding that plaintiff could perform other work available in the national economy.  *See generally* Def.'s Mot. for Order Affirming the Decision of the Comm'r, Doc. No. 29.  The Court addresses each argument in turn.

### a.   *The ALJ's and Appeal Council's Step Two Analysis of Plaintiff's Physical Impairments*

Plaintiff contends that the ALJ and the Appeals Council erred at Step Two in "not consider[ing] any of the non-severe [medically determinable impairments] in its decisions, [] most specifically the migraine disorder or visual impairment caused by convergence syndrome in the residual functional capacity assessment[.]"  Doc. No. 21-1, at 12. [7]

At Step Two, the ALJ determines the severity of a plaintiff's impairments.  *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  A "severe impairment" is "an impairment that limits [a claimant's] ability to do physical or mental work-related activities."  *Greek v. Colvin*, 802 F.3d 370, at 373 n.2 (2d Cir. 2015) (*citing* 20. C.F.R. §§ 404.1520(c), 404.1521).  At this step, plaintiff carries the burden of establishing that she is disabled and must provide the evidence necessary to make determinations as to her disability.  *See* 20 C.F.R. §§ 404.1512(a), 416.912(a);

---

[7] In its review of the record, the Court notes the specific language by the Appeals Council in its written opinion stating that:

> The Appeals Council adopts the Administrative Law Judge's statements regarding the pertinent provisions of the Social Security Act, Social Security Administration Regulations, Social Security Rulings and Acquiescence Rulings, the issues in the case, the evidentiary facts, as applicable…*The Appeals Council agrees with the Administrative Law Judge's findings under steps 1, 2, and 3 of the sequential evaluation.*

R. 4 (emphasis added).  This language suggests that the Appeals Council incorporated by reference the reasoning of the ALJ in the sequential evaluation process, specifically steps 1, 2 and 3, in their entirety. The Court is not persuaded otherwise.

*see also Baker v Comm'r of Soc. Sec.*, No. 1:15-CV-0787 (GTS/WBC), 2016 WL 1446117, at *2

(N.D.N.Y. Mar. 22, 2016). An impairment is "not severe" if it constitutes only a slight

abnormality having a minimal effect on an individual's ability to perform basic work activities.

*Id.,* at *3.

      If the ALJ finds any impairment to be severe, "the question whether the ALJ

characterized any other alleged impairment as severe or not severe is of little consequence."

*Jones-Reid v. Astrue*, 934 F.Supp.2d 381, 402 (D. Conn. 2012), *aff'd*, 515 F. Appx 32 (2d Cir.

2013) (citation and quotation marks omitted). "Under the regulations, once the ALJ determines

that a claimant has at least one severe impairment, the ALJ must consider all impairments, severe

and non-severe, in the remaining steps." *Pompa v. Comm'r of Soc. Sec.*, 73 F. Appx 801, 803

(6th Cir. 2003) (citation omitted). Therefore, if the ALJ considers all impairments at subsequent

stages of the analysis, failure to find a particular condition "severe" at Step Two, even if

erroneous, constitutes harmless error. *See O'Connell v. Colvin*, 558 F. Appx 63, 65 (2d Cir.

2014) ("Because this condition was considered during the subsequent steps, any error [in finding

it not to be severe at Step Two] was harmless."); *see also Reices-Colon v. Astrue*, 523 F. Appx

796, 798 (2d Cir. 2013). Non-severe impairments are considered if they are found to be

"medically determinable ... impairments." 20 C.F.R. §§ 404.1521, 416.921. Such impairments

must result from "anatomical, physiological, or psychological abnormalities that can be shown

by medically acceptable clinical and laboratory diagnostic techniques. Therefore, a physical or

mental impairment must be established by objective medical evidence from an acceptable

medical source." *Id*. A claimant will be found disabled only if the medically determinable

impairment ("MDI") causing disability "has lasted or can be expected to last for a continuous

period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). The SSA advises claimants:

"[w]e will consider only impairment(s) you say you have or about which we receive evidence."

20 C.F.R. §§ 404.1512(a)(1), 416.912(a)(1).  "The Regulations assure a claimant that the Social

Security Administration will consider all of the evidence presented concerning a claimant's

limitations when making a disability determination." *Warren v. Astrue*, No. 9-CV-6217, 2010

WL 2998679, at *3 (W.D.N.Y. July 27, 2010).

Here, the ALJ, and the Appeals Council (through its adoption of the ALJ's Step Two

conclusions), found that plaintiff had the following severe impairments: posttraumatic stress

disorder, major depressive disorder and anxiety.  R. 6.  As to plaintiff's claimed physical

impairments, the ALJ found that:

> thoracic spine strain, migraines, insomnia, vertigo and visual limitations in the left eye
> are non-severe impairments because they do not significantly limit the claimant's
> physical or mental ability to perform work-related activities…[and] the alleged traumatic
> brain injury, the post-concussive syndrome and the cognitive disorders are not
> medi[c]ally determinable impairments since they are not supported by medical evidence
> consisting of symptoms, signs and laboratory findings and not only an individual's
> statement of symptoms, as required under 20 CFR 404.1508 and 416.908[.]"

R. 16.

Plaintiff argues legal error in that the Appeals Council erred by "not consider[ing] any of

the non-severe MDI in its decision, and most[] specifically the migraine disorder or visual

impairment caused by convergence syndrome in the residual functional capacity assessment."  R.

21-1, at 12.  The Court finds that the Appeals Council adopted the ALJ's Step Two analysis in its

entirety and will therefore address plaintiff's concerns by reviewing the ALJ's evaluation at Step

Two. Because the ALJ found that plaintiff had other severe impairments at Step Two, he is

required to consider plaintiff's severe and non-severe impairments in subsequent steps of

evaluation.  *See Pompa*, 73 F. Appx at 803.  A review of the ALJ's decision reveals that the ALJ

satisfied this requirement.

The ALJ adequately considered plaintiff's non-severe impairments throughout his ruling. Specifically, the ALJ considered plaintiff's reports that her migraines were improving. *See* R. 16 The ALJ recognized that plaintiff's physical therapy was helping alleviate her headaches. R. 16 ("The claimant reported some improvement in her migraines, insomnia and vertigo with physical therapy and prescribed medications."). On December 10, 2018, plaintiff reported to Ryan Audrey, her physical therapist, that her headache was at a pain level of 7 out of 10. R. 1029. The following week, plaintiff demonstrated some improvement with a pain level of 5 out of 10. R. 1034. On March 8, 2019, plaintiff's other physical therapist, Geoffrey Fabry, PT, reported that after three visits "[p]atient [is] experiencing neck pain and heada[che] relief since starting therapy. Sleeping more due to new medication which also may be helping." R. 1156.

The ALJ also considered claimant's convergence syndrome, noting that "[a]n eye examination included a finding of visual limitations in the left eye described as convergence syndrome, but there was no discussion of any functional limitations in [claimant's] medical records." R. 16. The ALJ is likely referring to the consultation completed by Dr. Pulaski on January 30, 2019, where Dr. Pulaski noted that plaintiff had some visual impairments, but additional testing was necessary "to more clearly evaluate the degree of her impairments." R. 1042. The report indicated that plaintiff's "Near Point of Convergence" was mildly impaired, but other areas of the examination were normal. *Id.* Dr. Pulaski's report provided no recommendations as to any physical limitations and simply stated that plaintiff "should continue her current course of therapy until further evaluation [was] completed." *Id.* The medical report is void of any other records identifying additional treatment for plaintiff's convergence syndrome. Plaintiff only cites to one additional instance on December 10, 2018, where

plaintiff's Physical Therapist, Ryan Audrey, alludes to functional limitations caused by

convergence syndrome. Specifically, Audrey writes:

> Pt is a 43 y.o. female presenting to outpatient PT upon referral for MD for evaluation and treatment of [headaches] and concentration related deficiencies. She has sig[nificant] difficulty w[ith] concentration related tasks including dynamic visual acuity and NPC as she has difficulty w[ith] convergence w[ith] inc[rease] in [headache] related symptoms. She will benefit from skilled PT to improve her ability to concentrate on moving objects as well as focus on objects in the environment while performing dynamic head movements so that she can return to her prior level of independence w[ith] driving and functional activities including cooking and cleaning. *Pt will also benefit from a referral to a neuro optometrist to evaluate for further visual processing dysfunction which may be impacting her headaches.*

R. 1029 (emphasis added). It is clear from a complete reading of Audrey's assessment that

Audrey, being a physical therapist, was not skilled in the area of neuro-optometry and suggested

that plaintiff be referred to a specialist.  Plaintiff fails to cite to any other part of the medical

record that would reasonably persuade this Court to find that the ALJ erred in finding that

plaintiff's convergence was not severe. "Although the Second Circuit has held that [Step Two] is

limited to 'screen[ing] out de minimis claims' ... the 'mere presence of a disease or impairment,

or establishing that a person has been diagnosed or treated for a disease or impairment' is not, by

itself, sufficient to render a condition 'severe.' " *Baker*, 2016 WL 1446117, at *3 (*quoting Dixon

v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995), and *Coleman v. Shalala*, 895 F.Supp. 50, 53

(S.D.N.Y. 1995)).  Here, plaintiff has not demonstrated that her alleged medical determinable

impairments rose to the level of being "severe".  There was certainly substantial evidence for the

ALJ and the Appeals Council to conclude otherwise.

     As to plaintiff's reported migraines, the ALJ relied on the neuropsychological evaluation

conducted by Dr. Wrocklage that found that "claimant's endorsed factors of frequent migraines,

psychiatric distress, insufficient sleep and fatigue were contributing to the difficulties she

reported[.]"  R. 19.  The ALJ also relied on the examination conducted by Dr. Robert Dodenhoff,

a board-certified specialist in internal medicine, who examined the plaintiff as part of a Social

Security Consultative Examination in August 2018.  R. 20.  The ALJ stated that "Dr. Dodenhoff

did not opine [that] the claimant had any physical limitations, which was consistent with his

findings[.]" R. 20.  Specifically, Dr. Dodenhoff provided the following Medical Source

Statement:

> The [patient] is able to: sit, stand, walk, lift, carry and handle objects. Hearing and
> speaking are intact. The [patient] is able to understand, remember and carryout
> instructions [i.e.: following instructions for the eye chart, following instructions re:
> putting-on the examination gown, following instructions getting on/off the examination
> table, etc]. The [patient] should be able to respond appropriately to supervision,
> coworkers and the pressures in a work setting.

R. 890.  The ALJ found that Dr. Dodenhoff's "opinion was supported by the objective

radiographic evidence and essentially normal physical examination findings in the overall

medical record. These records indicated the claimant's back pain improved with chiropractic

care and the migraines were responsive to the use of prescribed medication[.]"  R. 20.

The record also indicates that plaintiff did not take her migraine medications as directed

by her treating physician.  On December 13, 2017, plaintiff's therapist, Teodoro Diaz, LCSW,

reported that the therapy session with plaintiff "focused on patient's sense of impotence in not

being able to improve sleep, mood and memory i.e. forgetfulness, and sense of disorientation and

dissociative states WITHOUT taking medication. PT has been adamant on NOT taking

medication due to side effects such as feeling too sedated."  R. 389 (emphasis in original). Again

on January 23, 2018, plaintiff reported to Diaz that she was not going to be taking her psychiatric

medications.  R. 558-559.  On October 16, 2018, plaintiff met with Dr. Ballough for treatment of

her ongoing headaches. Dr. Ballough instructed plaintiff to slowly taper herself off Sertraline (25

mg) for 30 days, and to start taking Metoprolol Succinate (50 mg) once a day.  R. 993 ("Patient

advised to begin titrating down from sertraline. She was cautioned against stopping sertraline

18

cold turkey because it can greatly effect *(sic.)* her mood. She was advised to taper down…[i]f

any adverse effects from the taper, to return immediately to discuss. Patient advised to begin

metoprolol daily for migraine prophylaxis[.]"). On a follow-up visit on November 12, 2018,

plaintiff reported to Dr. Ballough that she failed to take all the medications as prescribed.  R.

985. Dr. Ballough noted the following:

> Patient presents for a follow up on her migraine headaches. She notes that she stopped
> sertraline cold turkey. She notes that she knows that it isn't what she was instructed to do,
> but wanted to stop all unnecessary medication. She notes that she is not taking metoprolol
> either. She notes that she would like another Toradol injection, because that helped to
> relieve her headache at the time of the last visit.

R. 985.

When assessing the credibility of a claimant's subjective complaints, an ALJ must follow

a two-step inquiry.

> At the first step, the ALJ must decide whether the claimant suffers from a medically
> determinable impairment that could reasonably be expected to produce the symptoms
> alleged... If the claimant does suffer from such an impairment, at the second step, the ALJ
> must consider the extent to which [the claimant's] symptoms can reasonably be accepted
> as consistent with the objective medical evidence and other evidence of record.

*Stergue v. Colvin*, No. 3:13-CV-25 (DFM), 2014 WL 12825146, at *9 (D. Conn. May 30, 2014)

(citing *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010)).  If an individual's statements about the

"intensity, persistence, or functionally limiting effects of pain" are not supported by the medical

record, the ALJ must then make a determination as to the individual's credibility.  *Id.* The

regulations list seven factors for the ALJ to consider in making this determination, including: 1)

daily activities; 2) location, duration, frequency, and intensity of the pain; 3) precipitating and

aggravating factors; 4) *medications and their efficacy*; 5) other treatment; 6) any measures taken

for relief; and 7) other relevant factors. 20 C.F.R. §§ 404.1529, 416.929 (emphasis added). In

this case, the plaintiff's inconsistent compliance with the recommended medication regimen

weighs against her credibility as it makes it difficult to assess whether her alleged impairments would be sufficiently alleviated with medication, and therefore, thwarts plaintiff's position that the ALJ erred at Step Two.   "[A]n ALJ is entitled to make a factual determination that a [c]laimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary." *Jones v. Astrue*, 619 F.3d 963, 975 (8th Cir. 2010) (citation omitted). And, "misuse of medication is a valid factor in an ALJ's credibility determinations." *Chaney v. Colvin*, 812 F.3d 672, 677 (8th Cir. 2016) (quoting *Anderson v. Barnhart*, 344 F.3d 809, 815 (8th Cir. 2003)); *see Grindley v. Kijakazi*, 9 F.4th 622 (8th Cir. 2021) (ALJ was "within his discretion to discount [plaintiff's] complaints of pain" when plaintiff "failed to comply with recommended treatment and prescribed medication throughout the period of [] disability…[and] failed to keep up with her prescribed medication regimen").

The ALJ also considered the fact that plaintiff was treated at the hospital in June 2017 (after the accident) where she was treated for "upper and mild back pain without radiculopathy[,]" and diagnosed with "thoracic strain at discharge[.]"  R. 19. The ALJ highlighted, however, that "[s]ubsequent treatment records from her chiropractor revealed [plaintiff] complained of back pain, but her symptoms gradually improved with treatment[.]"  R. 19.  On August 9, 2017, plaintiff's chiropractor wrote, "Ms. C['s] mid back pain has improved a bit since her last visit with us…Ms. C['s] low back pain has experienced slight improvement." R. 482.  Again on August 24, 2017, Dr. Little wrote, "[s]ince her last visit, the patient has experienced some improvement."  R. 488.  Plaintiff's chiropractic records demonstrate an overall improvement of her condition.  On September 21, 2017, plaintiff reported that her "mid back pain was 4 on the 1 to 10 Pain Scale[,]" a significant improvement from a July 2017 pain assessment of 10 out of 10.  R. 479, 497.  Later in November 2017, plaintiff reported that her

mid back pain was a 2 on the 1 to 10 Pain Scale, signifying improvement of her pain levels.  R.

509.  On January 16, 2018, Dr. Little reported that "patient has experienced some

improvement."  R. 531.

Additionally, the ALJ relied on the independent medical examination by Dr. Mednick, a

board-certified neurologist, who found that plaintiff had "a combined permanent whole person

partial impairment of 11 [percent.]"  R. 1080.  Of that 11 percent impairment, however, only 3

percent was attributed to plaintiff's lumbar spine.  R. 1080.  Dr. Mednick's physical examination

of plaintiff revealed "[n]o pain to palpation of cervical spine, paraspinal muscles or shoulders.

Normal range of motion for both cervical spine and bilateral shoulders…[and n]ormal range of

motion for thoracic and lumbar spine."  R. 1079.

In its review of the record, this Court finds that the ALJ thoroughly considered the

evidence before him when determining plaintiff's physical condition, and that the ALJ's findings

are supported by substantial evidence.  Any conflict between the plaintiff's testimony and the

medical evidence is left for the ALJ to settle.  It is the function of the ALJ, not the reviewing

court, to "resolve evidentiary conflicts and to appraise the credibility of witnesses, including the

claimant."  *Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).  The

ALJ adequately considered the competing evidence.  The ALJ wrote:

> As for the claimant's statements about the intensity, persistence, and limiting effects of
> his or her symptoms, they are inconsistent because objective radiographic evidence of
> record, the claimant's statements to treating and examining sources, the mental status
> evaluations and the results of objective neuropsychological testing do not support the
> level of limitation alleged.

R. 19.  The ALJ relied on plaintiff's medical records from December 2017 which included a

"normal MRI of the brain."  R. 19.  The MRI found that the "ventricles are midline and normal

in size[,]" and that there are "no intra-axial or estra-axial mass lesions."  R. 384.  Dr. Dragicevic

reviewed plaintiff's MRI and found that it was "normal" and referred plaintiff for psychiatric

treatment.  R. 441.  The ALJ relied on Dr. Dragicevic's assessment that plaintiff had to seek help

with a psychiatrist or psychologist because the neurological "work up [] had been unrevealing

thus far" and "physical symptoms are most likely manifestations of her depression, anxiety and

stress.  R. 756; *see* R. 19.

The ALJ identified multiple severe impairments at Step Two.  R. 15-16.  He then

proceeded to the subsequent steps of analyzing the claimant's disability status.  R. 16-22.

Because the analysis did not stop at Step Two—this would have required a finding that the

claimant had no severe impairments and was thus not disabled—the ALJ did not prejudice the

claimant by not recognizing further severe impairments.  *See Stanton v. Astrue*, 370 F. Appx 231,

233 n. 1 (2d Cir. 2010).  Accordingly, plaintiff's argument that the ALJ erred at Step Two

regarding plaintiff's various non-severe impairments, specifically her migraine headaches and

convergence syndrome is unpersuasive, and the Court finds no error in the ALJ's and Appeal

Council's Step Two Analysis.  Plaintiff's argument here fails and remand is not warranted on

this ground.

***b.  The ALJ's and Appeals Council's Step Three Analysis of Plaintiff's Mental Impairments***

Next, plaintiff challenges the analysis the ALJ, and thus the Appeals Council, conducted

of plaintiff's mental impairments – principally arguing that the Step Three findings were

insufficient.  Doc. No. 21-1, at 19-26.  At Step Three, the ALJ determined that plaintiff's

impairments, either alone or in combination, did not meet or medically equal the severity of any

of the listed impairments in 20 C.F.R. pt. 404, Subpt. P, App. 1.  *See* R. 16.  Plaintiff argues that

the ALJ erred in his assessment of the severity of plaintiff's mental impairments.  Plaintiff claims

that the "ALJ, and therefore the Appeals Council, relied exclusively on the testing to determine if

there was a neurocognitive disorder…and ignored the cognitive issues caused by plaintiff's

psychiatric distress and psychosocial causes, as well as migraines." Doc. No. 21-1, at 22. Specifically, plaintiff argues that the ALJ failed to properly consider evidence regarding plaintiff's ability to respond to demands (Doc. No. 21-1, at 24); adapt to changes (*id.*); manage psychologically based symptoms (*id.*); distinguish between acceptable and unacceptable work performance (Doc. No. 21-1, at 25); set realistic goals (*id.*); and make plans for independent living (*id.*, at 26).

While an ALJ "should set forth a sufficient rationale in support of his decision to find or not to find a listed impairment," the absence of an express rationale for an ALJ's conclusions does not prevent the Court from upholding them so long as the Court is "able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence." *Berry*, 675 F.2d at 469. "The Social Security regulations list certain impairments, any of which is sufficient, at step three, to create an irrebuttable presumption of disability. The regulations also provide for a finding of such a disability *per se* if an individual has an impairment that is 'equal to' a listed impairment." *DeChirico v. Callahan*, 134 F.3d 1177, 1180 (2d Cir. 1998) (citation omitted) (emphasis in original); *see also* 20 C.F.R. §§ 404.1520(d), 416.920(d). Plaintiff bears the burden of establishing that her conditions meet a listing. *See Conetta v. Berryhill*, 365 F.Supp.3d 383, 396 (S.D.N.Y. 2019). "To show that [s]he meets the criteria, [plaintiff] must offer medical findings equal in severity to all requirements, which findings must be supported by medically acceptable clinical and laboratory diagnostic techniques." *Id.* (citation and quotation marks omitted). "To match an impairment in the Listings, the claimant's impairment must meet all of the specified medical criteria of a listing." *Raymond v. Comm'r of Soc. Sec.*, 357 F.Supp.3d 232, 237

(W.D.N.Y. 2019) (citation omitted).

Here, the ALJ found that "[t]he severity of the claimant's mental impairments, considered

singly and in combination, do not meet or medically equal the criteria of listings 12.04, 12.06,

and 12.11." R. 16.  When the Appeals Council adopted the ALJ's Step Three findings it wrote:

> At step 3, we adopt the finding that the claimant does not have an impairment or
> combination of impairments that meets or medically equals the severity of the
> impairments listed at 20 CFR Part 404, Subpart P, Appendix 1. Specifically, regarding
> listings 12.04, 12.06, and 12.11, we adopt the finding that the claimant has mild
> limitations in the ability to understand, remember, and apply information; moderate
> limitations in the ability to interact with others; mild limitations in the ability to
> concentrate, persist, or maintain pace; and mild limitations in the ability to adapt or
> manage herself.

R. 5.

Despite plaintiff's arguments to the contrary, the ALJ's opinion considered many of

plaintiff's mental impairments.  The ALJ considered: 1) the July 2017 neuropsychological

evaluation where plaintiff's "cognitive functioning fell within the low average range" (R. 16); 2)

a January 2018 neuropsychological test where plaintiff's "processing speed on a timed task was

low average" (R. 17); 3) mental status evaluations that described her as "angry, agitated and

irritable at times" (*id.*); 4) a testing result from November 2018 which "revealed a mild

impairment in the ability to switch between two task demands under time pressure" (*id.*); 5) that

plaintiff was assisted with activities like shopping because of memory issues (*id.*); 6) that family

members would assist plaintiff with meal preparation and household maintenance (*id.*); and 7)

that plaintiff had an overall loss of appetite (*id.*).

Against this evidence, the ALJ was also permitted to consider evidence about plaintiff's

life, daily activities and treatment.  Specifically, the ALJ considered plaintiff's: 1) July 2017

evaluation that explained that while plaintiff had some cognitive deficits, her "executive

functioning[, and] attentional and processing speed fell within the average and superior range of

24

functioning" (R. 16); 2) January 2018 neuropsychological test that "revealed [that] claimant's attention and working memory were normal" (*id.*); 3) psychiatric records from First Choice Health Center that described plaintiff as "a concrete thinker" (*id.*); 4) neuropsychological evaluation from September 2017 where plaintiff "was able to process information accurately and quickly with no evidence of delay, difficulty, or impairment" (R. 17); 5) November 2018 test results where plaintiff's "cognitive performance was not impaired" (*id.*); 6) account of being able to perform activities of daily living without assistance (R. 17) ("[d]uring her neuropsychological evaluation in September and October 2017, the [plaintiff] reported she was able to cook, but she was not comfortable cooking"); and 7) ability to manage her personal care (R. 17). Although plaintiff may object to how the ALJ weighed different pieces of evidence, where substantial evidence supports the ALJ's conclusion, it is not for this Court to substitute its judgment for that of the Commissioner. *See Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002). The ALJ provided an extensive discussion of the evidence he considered in making his Step Three findings that plaintiff only had "mild" and "moderate" limitations in each of the paragraph B areas of mental functioning. R. 17.

Moreover, in the ALJ's subsequent evaluation he expanded on his findings as to plaintiff's mental impairments. The ALJ considered that during plaintiff's June 2017 hospital visit "the examining physician described her as calm, awake, alert, ambulatory, speaking coherently and cooperative with no altered mental status or impaired mobility." R. 19. The ALJ noted that plaintiff's mental status evaluations at First Choice Health Centers "indicated the [plaintiff] had a difficult relationship with her daughter and there were observations [where] she exhibited an angry, aggressive, agitated and sad mood at times, *but her thought processes were clear and coherent*[.]" R. 20 (emphasis added). The ALJ also considered plaintiff's September

and October 2017 cognitive tests which "placed [plaintiff's] working memory in the average range." *Id*. The ALJ noted that the "neuropsychological testing done at Gaylord Hospital in November 2018 contained similar findings with the neuropsychologist opining that [plaintiff's] attention, working memory and visuo-motor processing speed were within normal limits". R. 20. The ALJ considered plaintiff's treatment records from First Choice Health Centers and noted that they "contained essentially normal cognitive findings." R. 21.

Although the ALJ might not have explicitly referenced every piece of the medical record for support for his findings in his written decision, there is support for his findings throughout. On the date of the accident, plaintiff was released to return to work within three days, and her only restriction was "[n]o heavy lifting [for] 7 Day(s)." R. 423. On an August 2017 emergency room visit, plaintiff was described as "alert and oriented" with "no focal deficits." R. 928. At that time plaintiff reported to the emergency department physician that she was "not dependent on [a] caregiver for [Activities of Daily Living]" R. 925. The November 2018 evaluation of plaintiff described her memory as "broadly within normal limits" (R. 1024), and her executive functioning was "within normal limits" (R. 1025). Ultimately, Dr. Wrocklage opined:

> Ms. [C's] current cognitive profile is broadly within normal limits, with some mild variability but no impairment identified in any cognitive domain. That is, her attention, working memory, processing speed, encoding and recall, visual and verbal information processing, and executive functioning were generally consistent with and, in some cases, higher than her estimated level of pre-morbid intellectual functioning. She endorsed difficulties with daily activities within the context of significant headaches, fatigue, and psychiatric distress. As above, Ms. C[.'s] cognitive performances were not impaired and her profile does not meet criteria for a cognitive diagnosis.

R. 1025. In light of the foregoing, the Court finds that the ALJ's conclusions at Step Three regarding plaintiff's mental disorders are supported by substantial evidence.

### c. The Appeals Council's Step Five Findings

Lastly, plaintiff argues that the Appeals Council and the ALJ erred at Step 5. "At Step

Five, the Commissioner must determine that significant numbers of jobs exist in the national economy that the claimant can perform." *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014). "[W]ork which exists in the national economy means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A) (internal quotations omitted). While the "claimant has the general burden of proving that he or she has a disability within the meaning of the Act … [a]t Step Five, the burden shifts to the Commissioner to show there is other work that the claimant can perform." *McIntyre*, 758 F.3d at 150 (internal quotations omitted). Here, plaintiff contends that the VE's testimony as to the existence and number of suitable jobs which the plaintiff could perform was over-inclusive, unreliable and not representative of the actual jobs available to plaintiff. Doc. No. 21-1, at 27-30. In essence, plaintiff disagrees with the VE's methodology in determining the number of jobs available in the national economy and posits that the ALJ's reliance upon such flawed testimony did not meet the ALJ's burden at Step Five. *Id.*

An ALJ may determine whether there are significant numbers of jobs in the national economy which the claimant can perform "by adducing the testimony of a vocational expert." *McIntyre*, 758 F.3d at 151. "An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as there is substantial record evidence to support the assumptions upon which the vocational expert based his opinion…and accurately reflect the limitations and capabilities of the claimant involved." *Id.* (internal citations and quotations omitted). Indeed, the ALJ "may present hypotheticals which accurately represent his findings regarding the claimant[']s RFC and allow the vocational expert to opine on the jobs which match that RFC available in the national economy." *Kelly v. Berryhill*, No. 3:17-CV-1703 (VLB), 2019 WL

27

1332176, at *15 (D. Conn., Mar. 25, 2019).

Here, the ALJ asked the vocational expert to consider a hypothetical scenario with plaintiff's RFC.  R. 77.  The ALJ made the following inquiry:

> [C]onsider an individual of the [c]laimant's age, education, and work history with the ability to perform all ranges of work. This individual is able to have occasional interaction with supervisors and coworkers, and incidental contact with the public…Is there [] work in the national economy[?]"

R. 77-78.  In response to the hypothetical, the VE identified three occupations that an individual with such limitations could perform and the number of jobs in the national economy the VE believed to be available for those specific jobs, namely janitor (2,604,000 jobs), order picker (2,046,040 jobs), and packer (700,560 jobs).  R. 78.  The VE opined that his testimony, for the most part, was consistent with the Dictionary of Occupational Titles ("DOT").  R. 78.  The DOT is a U.S. Department of Labor publication that "associates a job type with a specific code – for instance, '209.687-026 Mail Clerk' – and establishes that position's duties, including the minimum skill level and [the] physical exertion capacity it requires" to perform that job.  *Kelly*, 2019 WL 1332176, * at 15.  "Because of the detailed information appended to each DOT code, the codes are useful for determining the type of work a disability applicant can perform." *Brault v. Soc. Sec. Admin., Com'r*, 683 F.3d 443, 446 (2d. Cir. 2012).

The VE explained however, that while the DOT might define a job, it does not provide statistics as to how many of those jobs are available in the national economy.  *See generally* R. 76-85; *see also Brault*, 683 F.3d at 446 ("The DOT, however, just *defines* jobs. It does not report how many such jobs are available in the economy.") (emphasis in original).  For statistics on the number of jobs available, the VE must look to other national publications.   Here, the VE turned to the Standard Occupational Classification (hereinafter, "SOC") system, a federal system used to classify workers into occupational groups that produces employment and wage estimates and

provides detailed information about national job availability.  R. 83; *See* Standard Occupational Classification, U. S. Bureau of Labor Statistics, https://www.bls.gov/soc/.

"The SOC system groups together detailed occupations with similar job duties, and in some cases skills, education, and/or training." *Berryhill*, 2019 WL 1332176, * at 15.  However, SOC groups do not have a one-to-one correlation with DOT codes.  Rather, one SOC group, will consist of multiple DOT titles and as the Second Circuit has acknowledged "[t]his becomes a problem if DOT titles with different exertion or skill levels map to the same SOC code." *Brault*, 683 F.3d at 447 n.4.  Thus, as the Second Circuit has recognized, SOC codes "are not useful for disability proceedings because they do not contain the same detailed occupational information as DOT codes.  *Thus, a VE must use some method for associating SOC-based employment numbers to DOT-based job types.*" *Brault*, 683 F.3d, at 446 (emphasis added).

Here, the VE relied on the job incidence data from the SOC groups containing the DOT titles, among others, of janitor, order picker, and packer positions, to establish that there were approximately 2,604,000 janitor positions, 2,046,040 order picker positions and 700,560 packer positions nationally.  *See* R. 78.  Plaintiff argues that the DOT titles do not reliably match up with the SOC codes to provide accurate data.  That is, from what the Court can discern, plaintiff argues that because each SOC grouping consists of multiple DOT titles, providing the job incidence data of an entire SOC grouping would be over-inclusive and would not be representative of a singular DOT title.  Furthermore, according to plaintiff, the SOC system does not contain the same detailed occupational information (i.e., skill level, education experience required) as the DOT codes.  Because of the discrepancy between the DOT and the SOC, the VE must account for that information gap in determining how many positions exist for the jobs the

claimant could perform.  *See generally Kelly*, 2019 WL 1332176, at * 16.

Plaintiff contends that, while the VE testified that 2,046,040 order picker jobs exist in the nationally economy, the VE also testified on cross-examination that the "job incidence data (2,046,040 jobs in the national economy) was not just for DOT [title of order picker] but was for the [larger] SOC grouping of which [the DOT job of order picker] was just one listing."  Doc. No. 21-1, at 28.  In support of her argument the plaintiff explains that there are "553 different DOT [titles] under that SOC grouping…[and o]f those 553 DOT listings, 208 are HELPER jobs[,]" which would not align with plaintiff's RFC, and thus should not be considered in the total number of jobs proffered by the VE because they would not satisfy the hypothetical posed by the ALJ.  Doc. No. 21-1, at 28.  The DOT job title of order picker falls under the SOC grouping "51-9198.00" (Doc. No. 21-1, at 28), and reports approximately 2,046,040 jobs. However, as plaintiff contends, and this Court agrees, many of those 2,046,040 jobs could be attributed to occupations that do not meet the hypothetical criteria presented by the ALJ such that a smaller percentage of the larger SOC grouping would be available to plaintiff. Doc. No. 21-1, at 28.

Furthermore, as to the job of janitor, plaintiff argues that for the SOC grouping which encompasses janitor there are "sixteen specific separate DOT listings" and "[o]f the sixteen jobs, four have a [Specific Vocational Preparation, (hereinafter, "SVP"),] of 3, including janitor, and one has an SVP of 4[,]" suggesting that it is difficult to discern how many of those 2,604,000 jobs can be attributed to janitor positions or positions that align specifically with plaintiff's RFC. Doc. No. 30, at 6.[8]  As to the position of packer, plaintiff also argues that the job incidence data

---

[8] "SVP" is referred by the Social Security Administration as the "amount of lapsed time required by a typical worker to learn the techniques, acquire the information and develop the facility needed for average performance in a specific job-worker situation." *King v. Comm'r of Soc. Sec.*, No. 1:12-CV-1686 (GLS), 2013 WL 5567112, at *2 n.4 (N.D.N.Y. Oct. 9, 2013).  For example, "[u]nskilled work corresponds to an SVP of 1–2; semi-skilled work

is unreliable. *Id.*, at 8. Again, plaintiff claims that "the VE testified that the data as to the number of jobs in the national economy is not for just the one DOT numbered job, but for all jobs in the [larger] SOC grouping" including a job like "grocery packer" that does not align with plaintiff's RFC of only "incidental contact with the public." Doc. No. 30, at 8.

A similar Step Five argument was raised in *Brault,* 683 F.3d 443 (2d Cir. 2012). The plaintiff in *Brault* argued that "the numerical data provided by the SOC code do not enable a vocational expert to accurately determine the number of jobs within that SOC code for a particular DOT title." *Brault*, 683 F.3d at 446-47. However, the Second Circuit noted that, during the administrative hearing in *Brault,* the vocational expert provided the presiding ALJ with general SOC numbers, and then reduced the total number by removing any job titles that did not apply to the *Brault* claimant. *Id.* ("While acknowledging [plaintiff's] objections, [] the VE denied having reported the numbers for the entire SOC. Instead, he claimed to have 'reduced' the numbers from the 'the entire [SOC] code' to only account 'jobs…that [he knew] exist[ed].'") Accordingly, the Second Circuit found that the ALJ had met the requisite Step Five burden because the VE effectively reduced the SOC grouping number to what he attributed to the particular DOT title relevant to the claimant's RFC and the claimant's attorney was given a full opportunity to explore the issue. *Brault,* 683 F.3d at 450-451. Indeed, other courts have upheld ALJ decisions at Step Five where the ALJ relies on vocational expert testimony where the VE specifically accounted for the type of information gap or loss at issue here. *Brault*, 683 F.3d 443; *see also Kennedy v. Astrue*, 343 F. App'x 719, 722 (2d Cir. 2009) (upheld when "the

---

corresponds to an SVP of 3–4; and skilled work corresponds to an SVP of 5–9 in the DOT." *Id.* Here, the VE testified that plaintiff could perform the job of janitor, order picker, and packer – all categorized as unskilled, SVP 2. R. 78

vocational expert acknowledged that the data on which she relied in determining the existence of

'charge-account clerk' positions…also encompassed approximately 59 other DOT titles" but

"arrived at her estimated figures for charge-account clerk positions by discounting from the total

numbers for all 60 DOT titles."); *Fox v. Comm'r of Soc. Sec.*, No. 6:02-CV-1160 (FJS/RFT),

2009 WL 367628, at *3 (N.D.N.Y. Feb. 13, 2009) (affirmed VE who explained that the "system

monitor" job was a small percentage lower than the overall grouping); *see also Jones-Reid v.

Astrue,* 934 F.Supp.2d 381, 407 (D. Conn. 2012).  On the other hand, courts are likely to remand

if the VE relied "on incidence data for broad occupational groups that included positions other

than those the claimant could perform *without* offering an opinion as to how many positions

existed for the jobs the claimant could perform."  *Kelly*, 2019 WL 1332176 at *16 (holding that

ALJ's Step Five analysis did not meet the substantial evidence standard because VE's

methodology of utilizing DOT and SOC was over-inclusive and did not make clear how many

jobs would actually be available to the claimant) (emphasis in original); *see also Rosa v. Colvin*,

No. 3:12-CV-170 (LEK/TWD), 2013 WL 1292145 at *9-10 (N.D.N.Y. Mar. 27, 2013); *Johnston

v. Barnhart*, 378 F.Supp.2d 274 (W.D.N.Y. 2005).

Plaintiff here, in essence, argues that this matter falls into the latter category of cases akin

to *Kelly*, 2019 WL 1332176, because "[t]here is no basis to find that the data as to number of

jobs is equally distributed across the [] DOT listings [within the respective SCO grouping]…[and

t]here is no basis in the record to reform the data as to number of jobs to account for the

unreliable evidence."  Doc. No. 21-1, at  29.

Defendant responds by arguing that "[e]ven if the overall number that the expert gave for

each job is decreased significantly, that number would greatly exceed the number required for a

job to exist in significant numbers" and thus substantial evidence exists to prove that there are

sufficient jobs in the national economy that plaintiff can perform.  Doc. No. 29-1, at 13.  The

Court disagrees.  At no point in the VE's testimony does he elaborate, as required by *Brault*, on

how the job incidence data was reduced to account for the over-inclusivity seen in larger SOC

groupings. The VE makes no attempt to adjust his data to account for DOT titles that might fall

outside of plaintiff's RFC, and therefore, fails to account for such a discrepancy.  Based on the

VE's limited testimony, there is no way for this Court to discern how many jobs would be

available to plaintiff.  The Court recognizes the significant deficiencies in the vocational expert's

testimony and concludes that remand is warranted given the lack of substantial evidence

supporting the Appeals Council's decision at Step Five of its analysis.

Here, on cross-examination, the vocational expert acknowledged that his job incidence

data was based on the SOC code and not the individual DOT title.  R.  83.  The following

colloquy took place:

> Q: Okay. I just wanted to ask about the numbers you gave for the, for the *DOT* jobs you
> listed. Are those numbers for the specific *DOT* code or the job identified in that specific
> *DOT* code or for a group of jobs?
>
> A: A good point, Counselor. It, it is based on the SOC code. So, it's a change in the way
> in which the <u>Bureau of Labor Statistics</u> is doing their work based on (INAUDIBLE)
> which is supplement the *DOT* (INAUDIBLE).
>
> So, these, these are going to be SOC codes. So, there will be other *DOT* codes that will fit
> that…
>
> Q: Is it your testimony that every job within the SOC code for the – that includes the jobs
> with the *DOT* code numbers you gave today would also be a job that the hypothetical
> individual could work with the various restrictions that the Judge gave?
>
> A: I would say for the vast majority of them, yes. There is some types (sic.) of – some
> variability. So, there may be some erosion in that number. It's difficult to tell because the
> (INAUDIBLE) they don't give us a breakdown for –
>
> Q: Right.
>
> A: –you know, this is for, you know, say if this SOC had, say five or six different *DOT*

codes. You now, they're all very similar because they're all in that same SOC but they – there may be one of those that may be appropriate, but they don't give us percentage of what, what their metrics are to identify how many of those kind of (INAUDIBLE) title is which doesn't fit with, you know, or it's just perhaps it's an SVP: 2 might be a 3, or something like that.

So, there's going to be a percentage. Unfortunately because of the way in which this information is provided to us, the best we can do is give you the number that is provided by the <u>Bureau of Labor Statistics</u>, the only way you can get national surveys.

And note that, you know, like, there is (INAUDIBLE) going to be some variability in that number. But I think relative to other numbers, it's beneficial.

R. 83-84.

In mentioning the various DOT positions that applied to the ALJ's hypothetical, the VE acknowledged that the SOC groupings that he used to derive his job incidence numbers covered many other positions. Although the VE testified that the ALJ's hypothetical would apply to "a vast majority of [the DOT titles]" in the SOC grouping, he also acknowledged, there is "some variability" so there would be "some erosion" to his final number. R. 84. While the defendant points to the VE's testimony that a "vast majority" of DOT titles in the SOC grouping would be consistent with the ALJ's hypothetical in support of its argument, this general conclusory statement unsupported by any specific analysis or methodology falls short of the requirement set forth by the Second Circuit in *Brault* in this Court's view and does not rise to the level of substantial evidence necessary to sustain the Commissioner's burden at Step Five. In assessing the totality of his analysis and testimony, the VE did not attempt to identify how many of the additional DOT titles would align or not align with plaintiff's RFC, nor did he attempt to reduce the SOC numbers to a quantity that was solely representative of the three titles he had proffered, or at least to job titles that would be appropriate for plaintiff's RFC and the ALJ's hypothetical. The VE relied solely on the SOC grouping numbers without specifically discounting any potentially inapplicable titles that failed to align with plaintiff's RFC. In short, while the VE

34

recognized the lack of a one-to-one correlation between the DOT titles and the corresponding SOC codes, he did not actually address that gap in his final job numbers, thereby falling short of the Second Circuit's instruction in *Brault* that the VE must account for that "information loss" and use "some method" for correlating the SOC employment numbers to specific DOT job types. The Appeals Council relied on the VE's testimony when it concluded that plaintiff was "capable of performing work that exists in significant numbers in the national economy."  R. 6.  For the reasons previously identified, this Court finds that it is unclear from the VE's analysis exactly how many jobs would actually be available to plaintiff.  Therefore, the Appeals Council's decision at Step Five lacks the support of substantial evidence and remand is required for further consideration of the existence of positions in the national economy which plaintiff can perform.

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, the Court recommends that plaintiff's Motion for Judgment on the Pleadings (Doc. No. 21) be **GRANTED**, that defendant's Motion for an Order Affirming the Decision of the Commissioner (Doc. No. 29) be **DENIED**, and that the matter be remanded for further proceedings.

This is a recommended ruling.  Any party may seek the district court's review of this recommendation.  *See* 28 U.S.C. § 636(b) (written objections to proposed findings and recommendations must be filed within fourteen days after service of same); Fed. R. Civ. P. 6(a), 6(d) & 72; D. Conn. L. Civ. R. 72.2; *Thomas v. Arn*, 474 U.S. 140, 155 (1985). Failure to file timely objections to Magistrate Judge's recommended ruling waives further review of the ruling.

*Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992).

SO ORDERED, this 4th day of February 2022 at Bridgeport, Connecticut.


*/s/ S. Dave Vatti*
S. DAVE VATTI
United States Magistrate Judge

36